UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ATIF J. KHAN,

                                        Plaintiff,

                  vs                                    1:06-CV-357

BANK OF AMERICA, N.A.,

                                        Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                            OF COUNSEL:

ATIF J. KHAN
Plaintiff, Pro Se
10a Clifford Road
Menands, NY 12204

BOND, SCHOENECK & KING, PLLC            JAMES J. ROONEY, ESQ.
Attorneys for Defendant                 JOANMARIE M. DOWLING, ESQ.
111 Washington Avenue                   SARAH K. DELANEY, ESQ.
Albany, NY 12210-2280

EDWARDS ANGELL PALMER
   & DODGE LLP                          GINA DeSANTIS WODARSKI, ESQ.
Attorneys for Defendant
111 Huntington Avenue
Boston, MA 02199

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

_____Plaintiff Atif Khan ("Khan" or "plaintiff") brings this action pro se against defendant

Bank of America, N.A. ("the Bank" or "defendant"), under the Americans with Disabilities Act

("ADA"), 42 U.S.C.A. §§ 12101-12213 (West 2008) and Title VII of the Civil Rights Act of

1964 as amended ("Title VII"), 42 U.S.C.A. §§ 2000a-2000h-6 (West 2008).  Plaintiff alleges

that defendant violated the ADA and Title VII by discriminating against him on the basis of his disability, national origin, and religion.  Plaintiff also alleges that defendant retaliated against him for filing a complaint with the Equal Employment Opportunity Commission ("EEOC").

The Bank moves for summary judgment under Federal Rule of Civil Procedure 56. Plaintiff opposes.  The motion was taken on submission without oral argument.

## II.  FACTS

Because defendant moved for summary judgment, the following facts are portrayed in a light most favorable to plaintiff.  Plaintiff is a Pakistani and Muslim male born in 1974.  He was employed with the Bank as a computer operations technician starting September 1, 2004.[1]  The Bank systems operations unit is located at 101 Enterprise Drive, Kingston, New York.

In May 2004, Khan began to exhibit symptoms of constipation-predominant irritable bowel syndrome ("IBS").  Khan's IBS is characterized by abdominal pain and constipation.[2] Over-the-counter medications give him no relief, and the only reliable treatment is prune juice.  Using prune juice, he is able to achieve bowel movements two to three times per week.  Both his current primary care physician, Dr. Christopher Ashley ("Dr. Ashley"), and his former primary care physician, Dr. Rodney Camp ("Dr. Camp"), have recognized that the severity of IBS symptoms can be connected to stress.  Dr. Ashley has noted that IBS is poorly understood and it is difficult to predict the permanence of the condition.

---

[1]  Initially, the Bank temporarily employed Khan as a mail sorter from February 17, 2000 to December 20, 2003.  The Bank re-hired him as a mail sorter on May 24, 2004, and he became a full-time computer operations technician on September 1, 2004.

[2]  Constipation is defined as a "condition in which bowel movements are infrequent or incomplete."  Stedman's Medical Dictionary 386 (26th ed. 1995).

Khan testified that he exhibited IBS symptoms while the Bank employed him. Specifically, he claims that false accusations about his job performance caused him stress that made his stomach hurt constantly. He further states that the pain could be so intense at times that it forced him take leaves of absence. Khan admits, however, that the only occasions when he was unable to perform his job were when the Bank granted his leaves of absence.

Shawn Sprague ("Sprague"), the former technology operations manager at the Bank, hired Khan for the computer operations technician position. Sprague supervised Khan until February 2005. Plaintiff is not certain whether Sprague knew his national origin.

Upon his hire, Khan received approximately four months of training. His duties as a computer operations technician included: (1) running processes or jobs successfully; (2) maintaining accurate logs or schedules of the successful start and completion of those processes or jobs; (3) monitoring and controlling system performance; (4) operating consoles or online terminals; (5) operating and troubleshooting peripheral equipment; and (6) sending out deliverables for clients on time. He worked on the second of three shifts at the Bank. He was responsible for indicating the start and end time of jobs in the processing schedule, and initialing next to each job performed. The Bank contracts with clients to have processes completed by certain times. Plaintiff acknowledged in writing that his failure to fulfill his duties as a computer operations technician could lead to disciplinary action, including termination.

Around January 31, 2005, Khan received his 2004 performance evaluation from Sprague that noted his overall results met expectations. However, plaintiff's behavior did not meet expectations. Sprague also commented that plaintiff made minor mistakes that needed

to be prevented, and that he needed to work on his time management and communication skills. At the end of the evaluation, Sprague set up an action plan to help plaintiff progress in his career. The action plan recommended, among other things, ten training seminars. Khan states he was able to attend seven of the ten.

Michael Panzera ("Panzera") became technology operations manager and Khan's immediate supervisor in February 2005. Panzera knew plaintiff's national origin. He verbally counseled plaintiff for sending incorrect reports or deliverables to a client and running two jobs out of sequence. On February 22, 2005, Panzera again verbally counseled plaintiff for failing to send out certain deliverables on time. Panzera informed plaintiff that if his performance continued to decline he would be terminated. In response, plaintiff requested more training, which the Bank granted.

Around April 8, 2005, Khan interviewed for an operations analyst position at the Bank. According to Linda Mabie ("Mabie"), the operations manager, she declined to hire plaintiff because he lacked the requisite experience for the position. The Bank instead hired a candidate with the requisite experience. Khan, however, believes that his nationality or his written warning was the reason Mabie did not offer him the job.

On April 11, 2005, Khan received a written warning for failing to generate, sort, and distribute customer reports or deliverables. Plaintiff was aware that his behavior could result in termination, and he never mentioned to anyone that his performance issues could be due to his IBS.

On April 18 or 19, 2005, Khan engaged in a verbal dispute with the third-shift manager, Karl Sipperley ("Sipperley"). During the argument, plaintiff was defensive and raised his voice at certain times. Sipperley informed plaintiff that his attitude came across as

if he was unwilling to take criticism, but neither party remembers the specifics of the conversation.  Two other employees witnessed the altercation, and Sipperley informed Panzera of the incident.  Sipperley characterized such employee-supervisor altercations as commonplace.

On April 22, 2005, the Bank granted Khan's first request for a medical leave of absence.  Plaintiff points out that his co-workers Nicole Peck ("Peck") and Simon Hayes ("Hayes") received full paychecks during their disability leave, while he did not.  The Bank states that he was initially denied Short Term Disability ("STD") benefits under the Family and Medical Leave Act because he was not eligible until May 23, 2005 – his one-year milestone.  Peck and Hayes, on the other hand, were employed for several years.

The Bank granted Khan an unpaid medical leave of absence through June 23, which was later extended to July 31, 2005.  The Bank granted the unpaid leave request based on Dr. Camp's diagnosis of Khan's IBS.  Plaintiff testified that IBS and its associated symptoms are his disability because the symptoms affected his ability to perform his job.  Dr. Camp also noted that Khan's IBS substantially limited him in a major life activity in response to the Bank's written inquiry.

While on this unpaid medical leave of absence Khan traveled to Saudi Arabia from May 15, 2005, to June 9, 2005.  The purpose of the trip was to go to Mekkah to pray to Allah for his health.  Plaintiff made one visit to the emergency room of a hospital in Saudi Arabia for treatment of IBS symptoms.

Around July 25, 2005, Dr. Camp released Khan to return to work for four hours per day from August 1 to September 8, 2005, without any restrictions or limitations.  On August 1, 2005, plaintiff received his written warning from the April 18 or 19, 2005, verbal altercation

with Sipperley.  Plaintiff states that receiving that warning caused him stress and aggravated his IBS.  As a result, he requested and the Bank granted a second leave of absence, from August 3 to September 9, 2005.  Plaintiff received STD benefits during that time.

During his second leave of absence, Khan complained to the Bank's Advice and Counsel human resources hotline that his written counseling was unjust and he was being treated differently.  He also states that he did not receive proper training because he had three different trainers at the Bank.  Around August 18, 2005, the Bank informed him that they had investigated his complaints, but that his warnings would stand.  In response, plaintiff filed a charge with the EEOC in September 2005 alleging that the Bank discriminated against him on the basis of his national origin, religion, and disability.

Khan returned to work on September 9, 2005, with Dr. Camp's clearance.  At this time he requested prayer breaks.  Panzera and plaintiff agreed upon a schedule of when the prayer breaks would be taken.  Jon McGrew ("McGrew"), as Team Lead on second shift, was responsible for tracking all second shift employee's breaks to assure that the breaks were not abused.  Plaintiff contends that McGrew documented his prayer breaks and often appeared angry that he was taking them.  Plaintiff theorizes that it was because of his EEOC complaint, but he concedes he was never disciplined for taking prayer breaks.

When Khan returned to work he received extensive training, partially because the Bank assigned him new tasks.  According to plaintiff, coworkers Ray Maldonado, Sue Hendrickson ("Hendrickson"), Hayes, and Sipperley all received more training than him.  He concedes, however, that he has no idea how much training anyone received, except that Hayes received eight months of training because he openly talked about it.  Hayes, however,

worked on all three shifts at the Bank, and plaintiff admits that he does not know what tasks are performed on the other shifts.

Khan also says that his superiors, Panzera, McGrew, and Sipperley, were not counseled for the mistakes they made, but that he was counseled and terminated for the same mistakes. He, however, concedes that he does not know whether Panzera or McGrew ever received counseling for their mistakes. He further admits that the Bank counseled Sipperley for his mistakes. Finally, he states that his coworker Hendrickson made mistakes, but the record is unclear as to whether she received counseling.

Khan took a third leave of absence from October 27, 2005, to January 16, 2006. He received STD until November 15, 2005, when the Bank's STD administrator, Met Life, informed him that further STD benefits would be denied because it determined that he was no longer disabled. The Bank rejected his appeal of its decision in a correspondence dated February 1, 2006, based on the opinion of an independent physician. The Bank then granted him an unpaid medical leave of absence until February 23, 2006.

Khan returned to work around January 16, 2006. On February 2, 2006, plaintiff and Second Shift Team Lead, Raminder Bhangoo ("Bhangoo") engaged in a job-related verbal argument. Plaintiff admits that he placed a tape in the wrong media drive while doing an initialization procedure, but that Bhangoo treated him unprofessionally and disrespectfully. Bhangoo and plaintiff went to Sprague's office to discuss the incident. At some point, Khan began to say "I swear to god . . . ," but how he finished the sentence is contested. In any event, Sprague interrupted plaintiff because he found the words threatening and called building security to have plaintiff escorted off the premises. Plaintiff contends that Sprague fired him at this point. In any event, plaintiff threw his security badge on Sprague's desk and

slammed the door behind him as he left Sprague's office.  Shortly after, Sprague witnessed

plaintiff attempt to enter the Data Center from a secure access point, and instructed the staff

not to allow him to enter.  Sprague then personally escorted plaintiff from the building.  The

Bank claims plaintiff was not officially terminated until February 7, 2006, after a complete

review of the incident.

About February 17, 2006, Khan filed an amended EEOC complaint, alleging

retaliatory termination by the Bank.  The EEOC dismissed both his original and amended

complaints on March 8, 2006, finding no statutory violations.  However, in the same notice,

the EEOC gave him notice of his right to sue.  In March 2006, plaintiff filed this action.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to

interrogatories, admissions, and affidavits show that there is no genuine issue as to any

material fact, and that the moving party is entitled to summary judgment as a matter of law.

Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505,

2509-10 (1986); Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 436 (2d Cir.

1999); Lang v. Retirement Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).  The moving

party carries the initial burden of demonstrating an absence of a genuine issue of material

fact.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552

(1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990).  Facts, inferences therefrom,

and ambiguities must be viewed in a light most favorable to the nonmovant, Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986);

Richardson, 180 F.3d at 436; Project Release v. Prevost, 722 F.2d 960, 968 (2d Cir. 1983),

and pleadings of a pro se litigant must be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 92 S. Ct. 594, 596 (1972) (per curiam); Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356. At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

### B. ADA Claim

For an ADA employment discrimination claim, plaintiff has the burden of establishing a prima facie case. Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869 (2d Cir. 1998). A prima facie case consists of four elements: "(1) [plaintiff's employer] is subject to the ADA; (2) [plaintiff] was a person with a disability within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).

Under the first and fourth elements, defendant does not dispute that it is subject to the ADA or that Khan suffered an adverse employment action. However, the second and third are contested.

     **1. <u>Disability</u>**

     Under the second element, "a 'disability' is:  '(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" <u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 193, 122 S. Ct. 681, 689 (2002) (quoting 42 U.S.C.A. § 12102(2)).  Under (A), a plaintiff that is impaired is not automatically disabled under the ADA.  <u>Id</u>. at 195,122 S. Ct. at 690.  The impairment must "'substantially limit[] one or more of the major life activities of [an] individual.'" <u>Id</u>. at 193, 122 S. Ct. at 689 (quoting § 12102(2)).  "Major life activity" and "substantial limitation" are not defined in the ADA.  EEOC regulations, however, provide some guidance, and the Second Circuit has deferred to the EEOC's interpretations.  <u>See</u> <u>Francis v. City of Meriden</u>, 129 F.3d 281, 283 n.1 (2d Cir. 1997) (explaining that "great deference" is due to EEOC's interpretations of ADA).

     EEOC "regulations define 'major life activities' as 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and <u>working</u>.'" <u>Ryan</u>, 135 F.3d at 870 (quoting 29 C.F.R. § 1630.2(i) (emphasis added)). The Second Circuit has confirmed that working is a major life activity.  <u>Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.</u>, 198 F.3d 68, 73 (2d Cir. 1999); <u>Muller v. Costello</u>, 187 F.3d 298, 312 (2d Cir. 1999).  However, the Second Circuit has not settled whether the inability to control one's waste could be a major life activity.  <u>See</u> <u>Ryan</u>, 135 F.3d at 871 (holding that, assuming ability to control waste was major life activity, plaintiff failed to show that her colitis substantially limited this activity).

EEOC regulations define "substantially limited" as:

"(i) [u]nable to perform a major life activity that the average person in the
general population can perform; or
(ii) [s]ignificantly restricted as to the condition, manner or duration under
which an individual can perform a particular major life activity as
compared to the condition, manner or duration under which the average
person in the general population can perform that same major life
activity."

Ryan, 135 F.3d at 870 (quoting 29 C.F.R. § 1630.2(j)(1)).

"[S]ubstantially limit[ed in the ability to work] means" that a plaintiff is "significantly
restricted in the ability to perform either a class of jobs or a broad range of jobs in various
classes as compared to the average person having comparable training, skills and abilities."
29 C.F.R. § 1630.2(j)(3)(i).  Further, "[t]he inability to perform a single, particular job does not
constitute a substantial limitation in the major life activity of working."  Id.; see generally
Ryan, 135 F.3d at 872 (noting that plaintiff has burden of presenting evidence that defendant
perceived her to be incapable of performing "a broad range of jobs suitable for a person of
her age, experience, and training because of her disability.").  In other words, a plaintiff may
not simply offer evidence of a medical condition, but must offer specific evidence of how the
condition precludes him from a broad range of jobs.  Toyota, 534 U.S. at 198, 122 S. Ct. at
691; Sutton v. United Air Lines, Inc., 527 U.S. 471, 491-92, 119 S. Ct. 2139, 2151 (1999);
see also Colwell v. Suffolk County Police Dep't., 158 F.3d 635, 645 (2d Cir. 1998) (finding
that plaintiff failed to present evidence of substantial limitation in broad range of jobs
because only evidence was "general restrictions imposed by his doctor."); Sacay v. Research
Found. of City Univ. of N.Y., 193 F. Supp. 2d 611, 627-28 (E.D.N.Y. 2002) (holding that
plaintiff was not disabled when medical evidence submitted only suggested that her physical
impairments limited a single job function, not employment generally).  The EEOC regulations

advise that a court should consider the following three factors to determine if an employee is substantially limited in a major life activity:  "'(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" Id. at 870 (quoting 29 C.F.R. § 1630.2(j)(2)).  "'The term 'duration' . . . refers to the length of time an impairment persists'" and "'impact refers to the residual effects of an impairment." Ryan, 135 F.3d at 871 (quoting  29 C.F.R. pt. 1630, app. § 1630.2(j)).

Khan does not claim or present evidence that he has a record of an impairment or that defendant regarded him as having an impairment.  Thus, he must show that he was either substantially limited in the major life activity of working, or in the ability to control his waste.

Concerning his ability to work, Khan fails to demonstrate that he is unable to perform a class or broad range of jobs.  His only evidence is his doctors' general advice to avoid stressful situations that would aggravate his IBS.  However, specific evidence is required of a broad range of jobs that plaintiff is unable to perform to consider him substantially limited in his ability to work.  To the contrary, the evidence demonstrates that the stress which aggravates his IBS is only connected to the employment circumstances at the Bank.  He admits that his superiors' allegedly false accusations about his performance caused the stress which aggravated his IBS and forced him to take leaves of absence.  This implies that other jobs, or possibly a transfer within the Bank, may have alleviated his impairment.  Therefore, plaintiff fails to raise a triable issue of fact as to how his IBS substantially limits him in the major life activity of working.

However, assuming the ability to control one's waste is a major life activity, Khan may have raised a genuine issue of material fact that his IBS substantially limited him. The first factor from the EEOC regulations indicates that plaintiff is substantially limited, while the remaining two factors are inconclusive.

Under the first factor, the nature and severity of Khan's IBS weighs in favor of finding that he was substantially limited. The symptoms of his IBS are abdominal pain and constipation, which could be so intense at times that it forced him take extensive leaves of absence. Thus, his IBS is quite severe when he is symptomatic.

Under the second and third factors, duration and permanence, Khan's primary care physician has noted that IBS is poorly understood, and that it is difficult to predict the permanence of his condition. However, the length of plaintiff's leaves of absence indicate that his IBS can persist for long periods of time before subsiding, and the condition will probably plague him intermittently the rest of his life. In short, plaintiff's medical record provides sufficient facts to show that there is a genuine issue for trial, such that a rational finder of fact could determine that his IBS is a severe, persistent, and permanent condition. Thus, construing the pleadings of a pro se plaintiff liberally, and resolving all ambiguities in his favor, defendant did not carry their initial burden of demonstrating an absence of a genuine issue of material fact.

However, a trial to resolve that issue is unnecessary because Khan cannot prove the remainder of his prima facie case, that the Bank terminated him because of his disability – as discussed below.

### 2. **Qualified**

As to the third element, a plaintiff must be qualified to perform the essential functions of his job, with or without reasonable accommodation.  Essential functions are the position's non-marginal or fundamental duties.  Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(1) (1996)).  Under the EEOC regulations, a job duty may be essential if:  (1) the position only exists to perform that duty; (2) only a handful of employees are capable of performing that duty, or (3) the duty to be performed is highly specialized and the employee was hired for his expertise.  29 C.F.R. § 1630.2(n)(2) (2008).  Further, the EEOC regulations state that evidence of which duties are essential could include:

> (i) [t]he employer's judgment as to which functions are essential;
>
> (ii) [w]ritten job descriptions prepared for advertising or interviewing applicants for the job;
>
> (iii) [t]he amount of time spent on the job performing the function;
>
> (iv) [t]he consequences of not requiring the incumbent to perform the function;
>
> (v) [t]he terms of a collective bargaining agreement;
>
> (vi) [t]he work experience of past incumbents in the job; and/or
>
> (vii) [t]he current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).  Congress's legislative purpose for requiring that an employee be qualified was the concern that employers would be "forced to hire, promote, or retain unqualified, disabled employees."  Castellano v. City of N.Y., 142 F.3d 58, 68 (2d Cir. 1998).

Defendant contests that Khan was qualified to perform the essential functions of his job, with or without a reasonable accommodation.  However, there is only evidence that

plaintiff performed his job poorly at times.  The Bank counseled him verbally and in writing for performance issues during February and April 2005.  None of these counselings indicate that he was unable to perform the essential duties of his job based on the EEOC regulations. Morever, his performance issues were not related to his IBS, and therefore do not align with the purpose of the ADA's "qualified individual with a disability" language:  to make certain that employer's would not be forced to retain unqualified workers merely because they were disabled.  Castellano, 142 F.3d at 68.  In short, although plaintiff's performance and behavioral issues may have been grounds for termination, they do not indicate that he was unable to perform the essential functions of his job.  Thus, plaintiff satisfies the third element of his prima facie case.

### 3.  **Because of Disability**

As to the fourth element, to show that he was fired because of his disability, a plaintiff must demonstrate that his "disability played a motivating role" in his employer's decision to terminate him.  Parker v. Columbia Pictures Indus., 204 F.3d 326, 337 (2d Cir. 2000).  In this case, Khan supplied copious medical records of his impairment, but no evidence that would connect any of the Bank's adverse actions or statements to his IBS.  In fact, he fails to show that any of his supervisors or co-workers on his shift even had knowledge of his impairment.  Thus, plaintiff fails to raise a triable issue of fact as to the fourth element of his prima facie case.

In sum, Khan did not prove he was substantially limited in the major life activity of working because he did not present evidence of how his impairment would affect his ability to perform a broad range of jobs.  However, if the ability to control one's waste is considered a major life activity, then plaintiff presented an genuine issue of material fact that requires

resolution by a jury.  Again, that issue is moot because plaintiff failed to raise a question of

fact that the Bank fired him because of his disability.  Therefore, his disability discrimination

claim under the ADA cannot survive summary judgment.

### C.  Title VII Claims

#### 1.  National Origin Discrimination Claim

Khan argues that the Bank discriminated against him on the basis of his national

origin under Title VII.  He claims the Bank treated him differently and terminated because he

was Pakistani.  The McDonnell Douglas burden-shifting framework governs discriminatory

termination claims brought under Title VII.  Under that framework, first, plaintiff must

establish a prima facie case of discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S.

792, 802, 93 S. Ct. 1817, 1824 (1973); Shumway v. United Parcel Serv. Inc., 118 F.3d 60, 63

(2d Cir. 1997).  Second, if a prima facie case is established, the burden shifts to the

employer to offer a legitimate, nondiscriminatory reason for its actions.  McDonnell Douglas

Corp, 411 U.S. at 802, 93 S. Ct. at 1824; Shumway, 118 F.3d at 63.  Finally, if the employer

offers a legitimate reason, the burden shifts back to the plaintiff to prove that the employer's

proffered reason is a mere pretext for discrimination, and that discrimination was the true

reason for his termination.  McDonnell Douglas Corp., 411 U.S. at 804, 93 S. Ct. at 1825;

Shumway, 118 F.3d at 63.

To prove a prima facie case in a Title VII claim a plaintiff must prove that (1) he is a

member of a protected class, (2) he was qualified for his position of employment, (3) he

suffered an adverse employment action, and (4) the circumstances give rise to an inference

of discrimination.  Shumway, 118 F.3d at 63.  "While the plaintiff's burden of proof at this

initial stage of a discrimination case is far from onerous, he nevertheless must provide some

evidence - direct or circumstantial - to survive a motion for summary judgment." Murray v.

U.S. Dep't of Justice, FBI, 821 F. Supp. 94, 102 (E.D.N.Y. 1993) (internal citation omitted),

aff'd, 14 F.3d 591 (2d Cir. 1993).

Khan readily satisfies the first and third elements of his prima facie case.

Defendant does not dispute that plaintiff, who is Pakistani, is a member of a protected class.

Further, the Bank fired him, which is an adverse employment action. Thus, the only

elements at issue are two and four.

Under the second element, to be qualified a plaintiff must show that he meets the

employer's legitimate expectations based on its criteria for the position at the time the

employer terminated him. Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 29 (2d Cir. 1997). A

court may rely on supervisor evaluations as evidence of whether an employee met the

employer's legitimate expectations. Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985); see de

la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20-21 (2d Cir.

1996) (noting that an overall positive performance evaluation is enough to withstand motion

for summary judgment at prima facie stage). Plaintiff's burden to show he was qualified is de

minimus, but not inconsequential. Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 127 (2d

Cir. 2004).

As to the fourth element, when determining "whether the circumstances 'give rise to

an inference' of discrimination, must be a determination of whether the proffered admissible

evidence shows circumstances that would be sufficient to permit a rational finder of fact to

infer a discriminatory motive." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d

Cir. 1994). A plaintiff may show disparate treatment to raise an inference of discrimination,

which occurs when "the employer treat[s] plaintiff 'less favorably than a similarly situated

employee outside his protected group.'" Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)).  A plaintiff "'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" Id. (quoting Graham, 230 F.3d at 39).  For an employee to be similarly situated in all material respects, "those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuiness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001).  A court's undertaking is necessarily fact-specific due to the variability of employment discrimination cases. McDonnell Douglas, 411 U.S. at 802 n.13, 93 S. Ct. at 1824 n.13.

Under the second element, defendant disputes that Khan was qualified for the computer operations technician position due to his repeated errors.  In January of 2005, plaintiff received his 2004 performance evaluation which noted that his overall performance met expectations.  At this point, plaintiff was qualified for his position.  However, he was subsequently counseled verbally and in writing for performance issues in February and April 2005, followed by three leaves of absence running from April 22, 2005, to January 16, 2006. Thus, from February 2005 until the Bank terminated him in February 2006 plaintiff was not qualified because he no longer met the Bank's legitimate expectations for the computer analyst position.

Khan acknowledges that his job required him to:  (1) run processes or jobs successfully; (2) maintain accurate logs or schedules of the successful start and completion of those processes or jobs; (3) monitor and control system performance; (4) operate consoles or online terminals; (5) operate and troubleshoot peripheral equipment; and (6)

send out deliverables for clients on time.   On February 15, 2005, the Bank verbally

counseled plaintiff for sending incorrect reports or deliverables to a client, and running two

jobs out of sequence.  On February 22, 2005, he received another verbal counseling

because he failed to send out certain deliverables on time.  On April 11, 2005, he received a

written warning for failing to generate, sort, and distribute customer reports or deliverables.

Finally, on February 2, 2006, he placed a tape in the wrong media drive while doing an

initialization procedure.  After a verbal argument with Second Shift Team Lead Bhangoo

over that error, a series of events occurred that ultimately led to his termination.  In sum,

based on plaintiff's repeated errors over many months in direct contradiction of the Bank's

expectations for the computer analyst position, he failed to raise any question of fact that he

was qualified at the time he was terminated.

Khan also fails to present a triable issue of fact under the fourth element, that the

circumstances surrounding his firing give rise to an inference of discrimination.  He claims a

double standard, or disparate treatment, as compared to other non-Pakistani employees

concerning (1) training, (2) disciplinary action, (3) granting of STD benefits, and (4) hiring.

First, Khan presents no evidence of how much training any other employee

received, except hearsay evidence that Hayes received eight months of training.  Even

accepting the Hayes statement as fact, Hayes worked all three shifts at the Bank involving

work on multiple systems – unlike Khan.  This could readily explain any additional training

Hayes received, and demonstrates that he was not similarly situated in all material respects

to plaintiff.

Second, Khan alleges that he was counseled and terminated for the same mistakes

made by other employees who did not receive counseling.  He, however, does not present

any evidence to support his claim. Even accepting his bare allegations as true, in most of his anecdotes of disparate treatment he compares himself to his superiors – Panzera, McGrew, and Sipperley – who were not similarly situated.

Third, Khan claims that the Bank granted other employees STD benefits while denying him those same benefits. The Bank, however, explained that it does not pay disability benefits for employees of less than one year. The employees that plaintiff alleges received benefits all were employed for more than one year.

Finally, Khan presents no evidence surrounding his discriminatory failure to hire claim. He only asserts his mere belief that Mabie, the operations manager, denied him the operations analyst position at the Bank based on his nationality.

In sum, Khan's bare allegations of disparate treatment involving training, disciplinary action, granting of STD benefits, and hiring do not provide sufficient evidence for a rational fact finder to rule in his favor. Thus, plaintiff has failed to present a genuine issue of material fact concerning his prima facie case of national origin discrimination.

Even if Khan had raised a genuine issue of material fact in his prima case for national origin discrimination, the Bank supplied legitimate, nondiscriminatory reasons for his termination. Plaintiff's job-related errors and behavioral issues are ample evidence to rebut a presumption of discrimination, especially considering that the Bank informed him that his performance and behavioral problems could lead to termination. See Meiri, 759 F.2d at 997 (finding that the "profound inability to get along with her co-workers. . . . [is] a legitimate, nondiscriminatory reason for an employment decision"). Finally, plaintiff presents no additional evidence beyond the conclusory allegations in his filings and, thus, he did not raise a question of fact that the Bank's legitimate reasons for termination were mere pretext for

discrimination.  See, e.g., Memisevich v. St. Elizabeth's Med. Center, 443 F. Supp. 2d 276, 284 n.10 (N.D.N.Y. 2006) ("[C]onclusory allegations [are] insufficient to satisfy the burden of demonstrating pretext.").

### 2. Religious Discrimination Claim

Title VII provides that "an employer cannot discriminate against any employee on the basis of [his] religious beliefs unless the employer shows that he cannot 'reasonably accommodate' the employee's religious needs without 'undue hardship on the conduct of the employer's business.'" Philbrook v. Ansonia Bd. of Educ, 757 F.2d 476, 481 (2d Cir. 1985) (quoting 42 U.S.C.A. § 2000e(j) (2003)), aff'd & remanded on other grounds, 479 U.S. 60, 107 S. Ct. 367 (1986).  To prove religious discrimination under Title VII, first, a plaintiff must carry the minimal burden of establishing a prima facie case.  Philbrook, 757 F.2d at 481; Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000).  Then, the burden shifts to the employer to show that it could not reasonably accommodate plaintiff without undue hardship. Philbrook, 757 F.2d at 481.

A plaintiff can establish a prima facie case of religious discrimination by showing that:  "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement."  Philbrook, 757 F.2d at 481.[3]  Discipline must consist of an employment action such as termination, demotion, diminishment of major responsibilities that constitutes a "materially adverse

---

[3]  A plaintiff could also make a case for religious discrimination under Title VII based on disparate treatment, which would use the same prima facie test as national origin discrimination discussed above.  Khan, however, presents the same evidence for both claims and similarly fails raise a genuine issue of material fact that the circumstances give rise to an inference of religious discrimination.

change in the terms and conditions of employment," rather than merely an inconvenience. Bowles v. N.Y. City Transit Auth., No. 06-3101, 2008 WL 2699938, at *2 (2d Cir. July 10, 2008) (unpublished summary order) (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006)).

For the purposes of its motion, the Bank does not dispute that Khan, a Muslim, has a bona fide religious belief, or that he informed it of his belief. The Bank, however, contests that it disciplined plaintiff for failing to comply with a conflicting employment requirement.

Khan's prayer breaks throughout the day conflict with the employment requirement of working during those times. See Philbrook, 757 F.2d at 482 (finding plaintiff's observance of religious holy days conflicted with his employment requirements because he was forced to choose between receiving full salary and his religious beliefs). Plaintiff, however, fails to proffer any evidence of how he was disciplined as a result of his religious requirements. To the contrary, the Bank and plaintiff agreed on a schedule to allow him daily prayer breaks. He alleges that McGrew documented his prayer breaks and he appeared angry while doing so. McGrew's anger with plaintiff over the breaks, however, does not qualify as discipline. See, e.g., Bowles, 2008 WL 2699938, at *2 (affirming summary judgment for defendant where plaintiff could not establish that his supervisor's comment about his time off ever led to disciplinary action).

In sum, no reasonable juror could find that the Bank discriminated against Khan on the basis of his Muslim religion because he has failed to show that he was disciplined for failing to comply with a conflicting employment requirement. Plaintiff, therefore, does not raise a question of fact as to the third element of his prima facie case for religious discrimination.

### D.  Title VII and ADA Retaliation Claims

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice by this subchapter." Richardson, 180 F.3d at 443 (quoting 42 U.S.C.A. § 2000e-3(a) (2003)).  Both Title VII and ADA retaliation claims are analyzed using the McDonnell Douglas burden-shifting framework. Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001).  First, a plaintiff must carry his minimal burden of demonstrating a prima facie case of retaliation. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).  Next, the defendant has the burden of showing "a legitimate, nonretaliatory reason for the complained of action." Richardson, 180 F.3d at 443.  Finally, if the defendant carries his burden, a plaintiff must demonstrate that the legitimate reason offered is mere pretext for retaliation. Id.

"To establish a prima facie case of retaliation a plaintiff must show (1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision." Id.[4]  Defendant only contests the third element.

"[C]ausation can be shown either:  (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the

---

[4]  Proving an actual violation of the ADA is irrelevant to the plaintiff's prima facie case of retaliation "so long as he can establish that he possessed a good faith, reasonable belief that . . . the employer violated [the] law." Treglia, 313 F.3d at 719 (internal quotation marks omitted).  Defendant does not dispute that plaintiff's claim was made in good faith and reasonable.

defendant." <u>Gordon v. N.Y. City Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000); <u>see</u> <u>also</u> <u>Treglia</u>, 313 F.3d at 720 (noting that Second Circuit courts have found causation with close temporal relationship between protected activity and adverse action).

Khan contends that he was subjected to discriminatory treatment and terminated as a result of filing of his EEOC complaint.  He does not proffer any direct evidence of retaliatory animus or disparate treatment of fellow employees who engaged in similar conduct.  Thus, he could only prove causation indirectly, by showing that the filing of the EEOC complaint was followed closely by discriminatory treatment.

On August 15, 2005, Khan filed his EEOC complaint.[5]  His verbal and written counseling from his superiors had already taken place in February 2005 and April 2005, so they are irrelevant to the retaliation claim.   The only evidence of potentially discriminatory treatment would be the events of February 2, 2006, that led to his termination.  However, those events occurred almost six months later and are not temporally related.  Therefore, plaintiff raises no triable issue of fact that there was a causal connection between the filing of his complaint and his termination.

Morever, even assuming that Khan established his prima facie case, the Bank proffered legitimate, non-discriminatory reasons for terminating him.  Plaintiff admits to performance errors and behavioral problems in February 2005 and April 2005, as well as his unprofessional behavior on February 2, 2006.   Plaintiff argues that his termination was a mere pretext for retaliation, claiming a double standard concerning training, disciplinary action, granting of STD benefits, and hiring as compared to other non-Pakistani employees.

---

[5] Plaintiff's amendment to his EEOC complaint on February 17, 2006, is irrelevant because the Bank had already terminated him at that point.

However, as noted previously, these bare assertions do not suffice to raise an issue of triable fact.  Plaintiff, therefore, raises no issue of material fact that the Bank's legitimate, non-discriminatory reasons were a mere pretext for retaliation.

In sum, Khan has failed to raise a question of fact that the Bank retaliated against him because he has not offered any evidence of a causal connection between the filing of his EEOC complaint and his termination.  Further, even if he could show such a nexus, he does not present a question of fact that the Bank's legitimate, non-discriminatory reasons for terminating him were mere pretext for retaliation.

### E.  Defendant's Motion to Strike

Defendant moves to strike plaintiff's proffered factual averments and response to defendant's statement of facts.  The Bank contends that this documents fail to comply with Local Rule 7.1 and contain inadmissible factual evidence.  Khan did not oppose; therefore, this motion could be granted by default.  However, given the status of plaintiff as a pro se litigant and the interest in maintaining a complete record, as well as, resolution of defendant's motion in its favor on the merits, the Bank's motion to strike will be denied as moot.

## IV.  CONCLUSION

Under the ADA, plaintiff Atif J. Khan presented a triable issue of fact as to whether he was substantially limited in a major life activity and qualified to perform his job, however, he did not present a question of fact that he was terminated because of his alleged disability.

Defendant Bank of America, N.A. did not violate Title VII by discriminating against plaintiff based on his national origin because the circumstances did not give rise to an inference of discrimination, and plaintiff did not posit a triable issue of fact that the defendant's legitimate, non-discriminatory reasons for termination were mere pretext.

Defendant also did not violate Title VII by discriminating against plaintiff based on his religion because plaintiff failed to raise a genuine issue of material fact that he was disciplined for failing to comply with a conflicting employment requirement.

Finally, the Title VII and ADA retaliation claims are without merit because plaintiff could not raise an issue of fact that a causal connection existed between the filing of his EEOC complaint and an adverse employment decision.  Moreover, again, plaintiff failed to present any question of fact that the defendant's legitimate, non-discriminatory reasons for termination were mere pretext for retaliation.

Given this resolution on the merits, defendant's motion to strike is denied as moot.

Accordingly, it is

ORDERED that

1.  Defendant Bank of America, N.A.'s motion for summary judgment is GRANTED;

2.  Defendant's motion to strike is DENIED; and

2.  The complaint is dismissed in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated:    August 21, 2008
          Utica, New York.